UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL BLANCHARD                                              CIVIL ACTION

VERSUS                                                                        No. 13-5089

WEEKS MARINE, INC.                                            SECTION I

## ORDER AND REASONS

Before the Court is a motion[1] for summary judgment filed by defendant, Weeks Marine, Inc. ("Weeks"), in response to which plaintiff, Michael Blanchard, filed an opposition.[2] For the following reasons, the motion is **GRANTED**.

### BACKGROUND

The above-captioned matter relates to injuries that plaintiff sustained while working on the barge "WEEKS 246" at Weeks' shipyard in Bourg, Louisiana.[3] Plaintiff was employed as a welder/fitter by Atlantic Sounding Co., Inc. ("Atlantic") at the time of the incident.[4] Plaintiff was working alone and removing "wasted steel" from the stern of the WEEKS 246 when he pulled on a steel plate that suddenly and unexpectedly "fell into his hands," injuring him.[5]

Plaintiff filed a complaint in state court on July 1, 2013, alleging causes of action pursuant to the general maritime law, the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, and Louisiana state law.[6] Weeks removed the case to this

---

[1] R. Doc. No. 20.
[2] R. Doc. No. 24.
[3] *See* R. Doc. No. 20-7, at 1-3; R. Doc. No. 24-1, at 1-2.
[4] R. Doc. No. 20-7, at 1-2; R. Doc. No. 24-1, at 1.
[5] R. Doc. No. 20-7, at 2; *see* R. Doc. No. 24-1, at 1.
[6] R. Doc. No. 20-7, at 1; R. Doc. No. 24-1, at 1.

Court on July 16, 2013, on the basis of diversity of citizenship.[7] Weeks is seeking summary judgment on all of plaintiff's claims pursuant to § 905(b) of the LHWCA.[8]

## LAW AND ANALYSIS

### I.     Summary Judgment Standard

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not

---

[7] *See* R. Doc. No. 1.
[8] R. Doc. No. 20.

2

rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II.   Vessel Owner Negligence

The right of ship repairers, longshoremen, and other persons covered by the LHWCA to sue a vessel owner for negligence arises exclusively under 33 U.S.C. § 905(b).[9] "Under 905(b), the same worker may pursue a tort action against the owner of a vessel for acts of negligence." *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 531 (5th Cir. 1991).

Section 905(b) makes clear that the vessel owner may not be sued when the injury was caused by the negligence of those performing stevedoring services. 33 U.S.C. § 905(b); *Levene*, 943 F.2d at 532. The primary responsibility for longshoremen's safety rests with the stevedore. *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007) (quoting *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996)). However, following the U.S. Supreme Court's decision in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156

---

[9] Section 905(b) provides in pertinent part:
> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. *The remedy provided in this subsection <u>shall be exclusive of all other remedies against the vessel</u> except remedies available under this chapter*.

(emphasis added).

3

(1981), the U.S. Court of Appeals for the Fifth Circuit recognized limited circumstances where a vessel owner may be liable to a longshoreman injured during stevedoring operations:

> 1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known.
> 2) for injury caused by hazards under the control of the ship.
> 3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.

*Robinson*, 505 F.3d at 365 (quoting *Pimental v. LTD Canadian Pac. Bul*, 965 F.2d 13, 15 (5th Cir. 1992)).

The Fifth Circuit has stated that "although *Scindia* arose in the context of stevedoring operations, the duties it enumerates are not limited to stevedores." *Levene*, 943 F.2d at 533; *see also Hudson v. Schlumberger Tech. Corp.*, 452 F. App'x 528, 532-33 (5th Cir. 2011).

### III. Discussion

As an initial matter, the Court finds, and neither party disputes, that plaintiff is a longshoreman who is covered by the LHWCA. *See* 33 U.S.C. §§ 902(3),[10] 903(a).[11] Although plaintiff has asserted claims pursuant to the general maritime law and state law,[12] the LHWCA provides the exclusive remedy for an injured longshoreman who sues a vessel owner. *Id.*

---

[10] "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker . . . ." 33 U.S.C. § 902(3).

[11] Except as otherwise provided in this section, compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a).

[12] R. Doc. No. 20-7, at 1; R. Doc. No. 24-1, at 1.

§ 905(b). Accordingly, Weeks, as owner of the WEEKS 246, is only liable to plaintiff if it violated its *Scindia* duties.

        *A.*      *Turnover Duty*

The turnover duty relates to the condition of the ship upon commencement of the stevedore's operations. It requires a vessel owner to exercise due care under the circumstances to have the vessel and its equipment in such a condition that a worker can perform his duties with reasonable safety. *See Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994) (duty applies "upon the commencement of stevedoring operations").

A vessel owner may be liable for a breach of the turnover duty "if the vessel owner *fails to warn* on turning over the ship *of hidden defects* of which he should have known." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1245 (5th Cir. 1997) (internal quotation marks omitted). "Generally speaking, the defendant has not breached its duty to turn over a safe vessel if the defect causing the injury is open and obvious and one that the longshoreman should have seen." *Pimental*, 965 F.2d at 16. However, a shipowner may be liable for a breach of the turnover duty if the longshoreman's only alternatives to facing such a hazard are unduly impracticable or time-consuming or would force him to leave the job. *Moore v. ANGELA MV*, 353 F.3d 376, 381 (5th Cir. 2003); *Greenwood*, 111 F.3d at 1248; *Pimental*, 965 F.2d at 16 (citations omitted).

When a vessel is docked and undergoing repairs, a vessel owner's liability for negligence is viewed differently. The U.S. Supreme Court has explained that:

> [i]t appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The [shipowner], having hired [a contractor] to perform the overhaul and reconditioning of the vessel . . . was under no duty to protect [a longshoreman] from risks that were inherent in the carrying out of the contract.

5

*West v. United States*, 361 U.S. 118, 123 (1959). A shipowner "may not be found negligent merely because a condition of the ship that requires repair or inspection injures the person hired to inspect or repair that condition." *Stass v. Am. Commercial Lines, Inc.*, 720 F.2d 879, 883 (5th Cir. 1983) (internal quotation marks omitted) (quoting *Hill v. Texaco, Inc.*, 674 F.2d 447, 452 n.5 (5th Cir. 1982)). "Thus, when a vessel is turned over for repairs, the shipowner is generally under no duty to remove the hazards that are the intended object of the repairs or that are otherwise open and obvious." *Green v. CCS Energy Servs. LLC*, No. 08-792, 2009 WL 981720, at *4 (E.D. La. Apr. 9, 2009) (Vance, J.).

Defendant argues that "no hazards existed in the stern pocket" where plaintiff was working because "[a]ll plates and pipes were secure."[13] Defendant concludes that summary judgment is proper because "[t]he hazard that injured [plaintiff] resulted from [plaintiff] conducting his work of gouging steel in the stern pocket, not from any condition that existed when the [WEEKS] 246 was turned over" and because "[t]here is no evidence that Weeks had knowledge of the hazard."[14]

Plaintiff argues that two Weeks employees, Danny Chauvin ("Chauvin") and Dane Romano ("Romano"), ultimately made all decisions regarding the "materials to be removed and replaced, equipment to be used to assist on each task and number of workers for each task."[15] Plaintiff faults Chauvin and Romano for failing to determine whether plaintiff would require additional equipment or personnel to perform his work, "[d]espite their awareness of the unique characteristics of the workspace [plaintiff] would be working in and of the materials he was

---

[13] R. Doc. No. 20-1, at 7.
[14] R. Doc. No. 20-1, at 7.
[15] R. Doc. No. 24, at 8.

tasked with removing."[16] Plaintiff contends that Weeks' employees "should not have merely pointed out these plates and asked that they be removed after the initial planning was complete, but should have taken the time to properly plan this task."[17]

Plaintiff has not cited any authority supporting its argument that such conduct by Weeks implicates the turnover duty.[18] At the time the ship was turned over, the steel which injured plaintiff was welded in place and did not pose a hazard. The WEEKS 246 was at Weeks' repair facility in order to renew the vessel's "loadline certification," which required the removal and replacement of any "wasted steel" to ensure the safety of the vessel.[19] Plaintiff was engaged in this work at the time of his accident,[20] alongside numerous other Atlantic employees.[21] The very reason that Weeks contracted with Atlantic for plaintiff's services was so that it could "point[] out" the steel to be removed and have those orders carried out by Atlantic's welders.[22] The hazards posed by removing large, heavy pieces of steel were, therefore, "the hazards that [were] the intended object of the repairs." *See Green*, 2009 WL 981720, at *4.

Plaintiff testified that the steel plate which injured him may have also been rusted in place, which is why extra cutting was required and why it may have unexpectedly broken free.[23] However, there is no evidence that Weeks knew this plate was rusted or that it was in danger of moving in an unpredictable way. And even if Weeks did have complete knowledge of the hazards confronting plaintiff, it had no duty to remove such hazards because it contracted for

---

[16] R. Doc. No. 24, at 9.
[17] R. Doc. No. 24, at 9. As discussed below, Weeks' alleged failure to "properly plan" plaintiff's tasks is more properly construed as implicating the active control duty, not the turnover duty.
[18] R. Doc. No. 24, at 9.
[19] R. Doc. No. 24-2, at 6-7; R. Doc. No. 20-2, at 11.
[20] R. Doc. No. 20-5, at 18-19.
[21] *See* R. Doc. No. 20-3, at 4-5.
[22] *See* R. Doc. No. 24, at 9.
[23] R. Doc. No. 20-5, at 17.

7

plaintiff to do that exact job. *See id.* Simply put, "there is no indication in the record that the [work area] suffered from any dangerous condition that a reasonably competent [welder] would not have expected to encounter." *Id.*

Imposing a duty on Weeks to protect against the hazards presented by the heavy steel and its removal work would be "manifestly unfair" because it would hold Weeks responsible for "risks that were inherent in the carrying out of the contract." *See West*, 361 U.S. at 123. Accordingly, Weeks did not breach its turnover duty with respect to the hazards that led to plaintiff's injuries.

### B. Active Control Duty

"The 'Active–Control Duty' makes a vessel owner liable for injuries that arise out of its attempts to 'actively involve[] itself in [stevedoring] operations.'" *Landry v. G.C. Constructors*, 514 F. App'x 432, 435 (5th Cir. 2013) (alterations in original) (quoting *Scindia*, 451 U.S. at 170)). "The vessel has a duty to 'exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.'" *Pimental*, 965 F.2d at 16 (quoting *Scindia*, 451 U.S. at 167)). "[T]he owner has no general duty by way of supervision or inspection to discover dangerous conditions that develop in the area assigned to the stevedore." *Helaire v. Mobile Oil Corp.*, 709 F.2d 1031, 1036 (5th Cir. 1983); *see Turner v. Costa Line Cargo Servs., Inc.*, 744 F.2d 505, 509 (5th Cir. 1984).

"To determine whether a vessel owner retains active control over the contractor's work, we generally consider 'whether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the methods and operative details of the stevedore's work.'" *Hudson*, 452 F. App'x at 535 (quoting

*Dow v. Oldendorff Carriers GMBH & Co., KG*, 387 F. App'x 504, 507 (5th Cir. 2010)). The Fifth Circuit has "made plain . . . that a vessel owner will not trigger a duty by having its employees board the vessel daily 'to ensure the security of the ship and to check on the progress of the contractor's work.'" *Id.* at 535 n.4 (quoting *Futo v. Lykes Bros. Steamship Co.*, 742 F.2d 209, 210 (5th Cir. 1984)); *Dow*, 387 F. App'x at 507 ("A vessel owner does not trigger a duty by having its employees check on the progress of the contractor's work.").

Even though "the captain of the vessel retains the ultimate authority to make decisions about the operation of the vessel and the safety of those aboard, this overarching authority is not the equivalent of 'active control' for purposes of the owner's duties under *Scindia*." *Fontenot v. McCall's Boat Rentals, Inc.*, 227 F. App'x 397, 403 (5th Cir. 2007). However, "although a vessel owner no longer retains the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997).

Weeks asserts that it "was not involved in the actual methods of work used by [plaintiff], nor the operative details of the work."[24] "The only information that Weeks provided was the information for what material needed to be removed and replaced."[25] Weeks notes that Blanchard worked alone and that Chauvin and Romano merely "would periodically check on the progress of the refurbishment" of the vessel.[26]

Plaintiff argues that "once work commenced, Chauvin and Romano maintained active control of the WEEKS 246 and were regularly involved in reviewing the ongoing work,

---

[24] R. Doc. No. 20-1, at 8.
[25] R. Doc. No. 20-1, at 8.
[26] R. Doc. No. 20-1, at 8.

9

designating additional work, and marking additional metal to be removed with chalk based on the work already performed."[27] According to plaintiff, "Romano would make several walkthroughs a day to check on the work, alert the workers to missed items, or inform the workers of additional items that needed to be cut or replaced, and Chauvin would come out at times to inform the workers as to what needed to be cut."[28] Plaintiff concludes that a genuine issue of material fact exists because "[b]oth Chauvin and Romano maintained active oversight of the work and continued to supervise and oversee the work as it was performed."[29]

Accordingly, the Court examines the three considerations set forth in *Hudson*, 452 F. App'x at 535 ("[W]hether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the methods and operative details of the stevedore's work."). First, the area in question was clearly within plaintiff's work area. Plaintiff testified during his deposition that he was assigned to gouge steel in the stern pockets,[30] that he worked alone,[31] and that he would only occasionally have interaction with others.[32] Second, the work area had been turned over to plaintiff. Atlantic was performing work over the entire ship, including plaintiff's assigned area at the stern of the ship, in order to carry out the repairs designated on the cut list,[33] and the fact that Chauvin and

---

[27] R. Doc. No. 24, at 10.
[28] R. Doc. No. 24, at 11.
[29] R. Doc. No. 24, at 10-11.
[30] R. Doc. No. 20-5, at 15; R. Doc. No. 20-2, at 15.
[31] R. Doc. No. 20-5, at 13-14.
[32] *See* R. Doc. No. 20-5, at 21.
[33] R. Doc. No. 20-3, at 5. Anthony Bourgeois ("Bourgeois"), Atlantic's employee and yard supervisor at the time of the WEEKS 246 project, testified in his deposition that he would create a "game plan" for performing all the work that Weeks required, in consultation with Ed LeBouef ("LeBouef") and Ray Percle ("Percle"). R. Doc. No. 20-3, at 4-5; *see* R. Doc. No. 20-2, at 17. Percle, an employee of Masse Contracting, Inc. ("Masse"), was the welding leadman at the time of the incident, and LeBouef was the project foreman. R. Doc. No. 24-2, at 3. Chauvin's unrebutted deposition testimony is that Percle reported to LeBouef, who reported to Bourgeois,

10

Romano checked on the progress of the work and designated additional repairs does not indicate that they retained control of that portion of the ship. *See id.* at 535 n.4; *Dow*, 387 F. App'x at 507. Accordingly, the first two considerations weigh against imposing a duty.

The third consideration poses a more challenging question. Plaintiff also contends that Chauvin and Romano ultimately made all decisions regarding the "materials to be removed and replaced, equipment to be used to assist on each task and number of workers for each task."[34] Plaintiff contends that Chauvin's and Romano's initial determinations as to whether "a forklift or additional personnel should be used to assist in this task" were never revisited by Atlantic, who "adhere[ed] to the 'work list' in performing the various tasks set forth for the WEEKS 246 without variation."[35] Although plaintiff does not raise these arguments in connection with the active control duty,[36] these allegations implicate the issue of "whether the vessel owner control[led] the methods and operative details of the stevedore's work.'" *See Hudson*, 452 F. App'x at 535.

Plaintiff is an experienced, highly qualified welder and considers himself to be an expert at his job.[37] Plaintiff testified that, although Bourgeois and Percle would occasionally check in on him, there was no question in his mind about what he had to do or how to go about completing his assigned task.[38] Plaintiff was not instructed regarding how to go about his work—he testified only that he "was instructed to cut all the welds off[39] and what I could—what I could tolerate to

---

who reported to Romano and Chauvin. R. Doc. No. 24-2, at 3. Plaintiff received his assignments from Percle. R. Doc. No. 24-4, at 14; *see* R. Doc. No. 20-5, at 14.

[34] R. Doc. No. 24, at 8.
[35] R. Doc. No. 24, at 12.
[36] Plaintiff makes these arguments in connection with the turnover duty and the duty to intervene.
[37] R. Doc. No. 20-5, at 12.
[38] R. Doc. No. 20-5, at 21.
[39] Plaintiff testified that he could not cut the plate into smaller pieces because it would damage the deck of the ship. R. Doc. No. 20-8, at 13. However, plaintiff never complained about this

move, to move."[40] Chauvin's unrebutted testimony is that he and Romano[41] would give Atlantic's welders "a general location with markings on the steel to come out. And then if they find that it needs to go further, they'll get with their supervisor which gets with us, and then we'll revise our list."[42] Bourgeois testified that Romano and Chauvin would check on the progress of the work "[a] couple of times a week."[43] Ivy Terrebonne ("Terrebonne"), another welder on the WEEKS 246, testified that Romano and Chauvin monitored his work area once or twice a day, sometimes more, in order to check that all work was being completed and designate additional cutting.[44]

Chauvin testified that, as part of the planning process and for purposes of cost estimation, he would make an estimate of the number of man hours a particular task would require,[45] and "[w]hen it's known that you're going to need a crane or a forklift, it's usually just noted on the work order that you may need a forklift or a crane."[46] However, Chauvin testified that, despite his estimations, he "leave[s] lining up the crew to the yard supervisor."[47] The cut list, which is a document that was provided to the yard supervisor and the project foreman,[48] does not describe

---

limitation, and he did not believe that cutting along the welds could cause an accident. R. Doc. No. 20-8, at 14. Plaintiff did not specify who, if anyone, instructed him regarding these cuts.

[40] R. Doc. No. 20-5, at 23. Chauvin did testify regarding some of the specifics about how this work would generally take place and how plaintiff would have had to position himself to do his job. R. Doc. No. 24-2, at 21-23. However, Chauvin did not testify that he instructed plaintiff or anyone else regarding any of these specifics.

[41] Neither party submitted any statements or testimony by Romano.

[42] R. Doc. No. 24-2, at 9.

[43] R. Doc. No. 24-4, at 11.

[44] R. Doc. No. 24-5, at 5-6.

[45] R. Doc. No. 24-2, at 12. Chauvin testified that the assignment of workers "is done by the yard supervisor," Bourgeois, and that although he would occasionally discuss such matters with the yard supervisor, he could not recall any specific instance where he had done so. R. Doc. No. 20-2, at 9.

[46] R. Doc. No. 24-2, at 11.

[47] R. Doc. No. 24-2, at 19.

[48] R. Doc. No. 24-2, at 15.

any equipment or personnel requirements.[49] Rather, the cut list is nothing more than a detailed list of all the repairs that the WEEKS 246 required.[50]

The Court finds that plaintiff has not raised a genuine issue of material fact regarding the third consideration as set forth in *Hudson*. Plaintiff's own deposition testimony establishes that the methods and operative details of his work were solely within his control. To the extent that Chauvin, Romano, or any other person was involved with plaintiff's work, it was solely to check on his progress and to designate additional work to be done. These activities by themselves do not constitute "active control" over plaintiff's work area or operations. *See Hudson*, 452 F. App'x at 535 n.4; *Dow*, 387 F. App'x at 507.

Having reviewed all the evidence submitted by the parties, the Court concludes that the three considerations described in *Hudson* do not indicate that Weeks maintained active control of the repair operations, and that there is no genuine issue of material fact with respect to whether Weeks retained operational control over plaintiff's work. Accordingly, Weeks did not violate the active control duty with respect to the work that brought about plaintiff's injuries.

      C.      Duty to Intervene

A vessel owner is required to intervene when the owner "has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of *obviously improvident* judgment, has failed to remedy the hazard." *Greenwood*, 111 F.3d at 1248 (emphasis added) (internal quotation marks omitted); *see Singleton*, 79 F.3d at 28. In order to

---

[49] R. Doc. No. 24-3. Another document or set of documents referred to as a "work list" and/or "work order" was created during the process of planning the work, and those documents included a calculation of man hours as estimated by Chauvin, Romano, and (possibly) Bourgeois. *See* R. Doc. No. 24-2, at 13-15. However, these documents are not a part of the record. Additionally, Bourgeois testified that the cut list was the primary document that he used when assigning tasks, but that Chauvin would also supplement the cut list with verbal instructions regarding additional cutting. *See* R. Doc. No. 24-4, at 13-16.
[50] R. Doc. No. 24-3.

prevail on a claim that the vessel breached the duty to intervene, "the longshoreman must show not only that the shipowner had actual knowledge" of the hazard and of the stevedore's continuing hazardous operations, but also (1) that the vessel owner had actual knowledge that the hazard "posed an unreasonable risk of harm," and (2) that the vessel owner had "actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of injury." *Greenwood*, 111 F.3d at 1248 (citing *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990)). The duty to intervene is narrowly construed and requires more than mere knowledge of a dangerous condition. *Greenwood*, 111 F.3d at 1249; *Singleton*, 79 F.3d at 28. As stated by the Fifth Circuit:

> To impose a duty to intervene on the shipowner, respecting dangers not created by it which are obvious to the stevedore's employees and arise during and in the area of the stevedore's operations, something more is required than the mere shipboard location of the dangerous situation and the shipowner's knowledge of it.

*Singleton*, 79 F.3d at 28 (quoting *Futo*, 742 F.2d at 215).

In order for the expert stevedore's judgment to appear "obviously improvident," plaintiff must demonstrate that a condition exists that is so hazardous that anyone could tell that continued operations "create[] an unreasonable risk of harm even when the stevedore's expertise is taken into account." *Greenwood*, 111 F.3d at 1249. Noting that the Fifth Circuit cases "are unanimous in stating [that] knowledge alone is not enough," the court in *Williams v. M/V SONORA* emphasized that "[t]he 'something more' requirement provides a useful and helpful threshold below which owners are not liable." 985 F.2d 808, 815 (5th Cir. 1993); *see also Hunter v. Intreprinderea de Explore Flott Maritime Navrom*, 868 F.2d 1386, 1388 (5th Cir. 1989) (per curiam) (finding no duty to intervene notwithstanding the assumptions that the stevedore's operations were dangerous, that the owner knew that the stevedore's practices were dangerous, and that the plaintiff could not avoid the danger). "It might well be 'reasonable' for the owner to

14

rely on the stevedore's judgment that the condition, though dangerous, was safe enough."

*Helaire*, 709 F.2d at 1039 n.12.

> The *Futo* court outlined considerations that pertain to the existence of these basic conditions: [1] whether the danger was open and obvious; [2] whether the danger was located within the ship or ship's gear; [3] which party created the danger or used the defective item and was therefore in a better position to correct it; [4] which party owned and controlled the defective item; [5] whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and [6] whether the shipowner assumed any duty with regard to the dangerous item.

*Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985).

Weeks asserts two reasons why plaintiff cannot show that it breached its duty to intervene. First, Weeks asserts that that the accident was a "spontaneous event" about which Weeks had no actual knowledge.[51] Second, Weeks asserts that the condition was "caused by [plaintiff's] work in cutting on the plate" and that "[t]he entire situation was controlled by [plaintiff]."[52] Plaintiff argues that Weeks knew he "would be working in a confined space removing materials that presented a unique hazard" and that Atlantic and Masse "were adhering to the 'work list' in performing the various tasks set forth for the WEEKS 246 without variation."[53]

As discussed above, Weeks knew that plaintiff would be "working in a confined space removing materials that presented a unique hazard"[54] because Weeks specifically contracted with Atlantic, plaintiff's employer, for such materials to be removed. The hazards posed by removing steel were, therefore, "the hazards that [were] the intended object of the repairs." *See Green*, 2009 WL 981720, at *4. Finding a violation of the duty to intervene under these circumstances would essentially require Weeks be a guarantor of the safety of its contractors' employees.

---

[51] R. Doc. No. 20-1, at 9-10.
[52] R. Doc. No. 20-1, at 10.
[53] R. Doc. No. 24, at 12.
[54] R. Doc. No. 24, at 12.

15

Even if the first component of the duty to intervene is present—a finding this Court does not make—plaintiff has still not raised a genuine issue of material fact with respect to whether Weeks knew that Atlantic could not be relied upon to protect its employees or that conditions posed a substantial risk of injury. *See Greenwood*, 111 F.3d at 1248. Plaintiff merely asserts, without citation to the record, that Weeks knew Atlantic would adhere to the work list "without variation."[55]

The cut list, which was provided to the yard supervisor and the project foreman,[56] does not describe any equipment or personnel requirements.[57] Plaintiff does not explain how such adherence put Atlantic's employees in any danger at all. Plaintiff produced no evidence that the work list discouraged Atlantic in any way from requesting additional equipment or personnel when needed, and Chauvin's unrebutted deposition testimony is that Weeks would "always preach to them: If you think you need help, always ask for help."[58] Terrebonne also testified that, while working on the WEEKS 246, he was allowed to stop his assigned task to help anyone who needed it at any time, including offering to help carry heavy items.[59] Neither plaintiff nor anyone else requested additional resources for this task, and plaintiff removed two similar steel plates without incident before being injured while removing the third.[60]

This Court's conclusion is strengthened by a consideration of the factors outlined in *Casaceli*, 774 F.2d at 1328. First, although the hazards may not have been open and obvious, "there is no indication in the record that the [work area] suffered from any dangerous condition that a reasonably competent [welder] would not have expected to encounter." *See Green*, 2009

---

[55] R. Doc. No. 24, at 12.
[56] R. Doc. No. 24-2, at 15.
[57] R. Doc. No. 24-3; *see also supra* note 49.
[58] R. Doc. No. 24-2, at 13.
[59] R. Doc. No. 20-6, at 4.
[60] R. Doc. No. 20-5, at 18-19.

WL 981720, at *4. Second, although a component of the ship, itself, presented the danger, the need to remove wasted steel was the very reason that Weeks contracted for plaintiff's services, and these "hazards [were] the intended object of the repairs." *See id.* Third, plaintiff was alone at the time of the accident and he was the sole person who manipulated the injury-causing steel plate.[61] Fourth, as discussed above, although Weeks owned the ship, Atlantic was in control of the area at the time of the injury. Fifth, plaintiff has not produced evidence of Weeks acquiescing in any dangerous activity or taking any affirmative action beyond specifying the steel that was to be removed. Sixth, plaintiff has not produced any evidence that Weeks voluntarily assumed any duty with respect to the removal of any steel in plaintiff's work area.

Because Weeks neither had actual knowledge that the hazard "posed an unreasonable risk of harm," nor had "actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of injury," *Greenwood*, 111 F.3d at 1248, plaintiff has failed to raise a genuine issue of material fact with respect to whether Weeks violated its duty to intervene.

---

[61] R. Doc. No. 20-5, at 20 ("Q: As you sit here today, do you agree that: 'The incident was purely an accident, and not the fault of any person, company, or defective equipment'? A: Yeah. It wasn't—I mean, it—that was more—more or less the—the will of God that—that made that plate move. That's the only answer I can—which I could give you. Except when the plate started moving, though, I had to react, and the reaction was poorly. Poorly. I—I reacted poor because . . . ."). Bourgeois testified that "personally manhandling it [was] not the right way" to perform the task and that a forklift should have been used. R. Doc. No. 24-4, at 19.

## CONCLUSION

For the foregoing reasons, there is no genuine issue of material fact with respect to whether Weeks violated its *Scindia* duties, and § 905(b) of the LHWCA does not impose any liability on Weeks, as owner of the WEEKS 246, for plaintiff's injuries. As previously stated, that section provides the exclusive remedy for plaintiff against Weeks as vessel owner. Accordingly,

**IT IS ORDERED** that the motion is **GRANTED**.

**IT IS FURTHER ORDERED** that all of plaintiff's claims in the above-captioned matter are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, April 11, 2014.

**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**